UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEDRO TRUJILLO,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>RALPH DIAZ,<br><br>　　　　Respondent. | Case No.: 1:12-cv-02087-AWI-SAB (HC)<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>(ECF No. 1) |

Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**I.**

**RELEVANT HISTORY**

Following a jury trial in Kern County Superior Court, Petitioner was convicted of premeditated murder (count 1), premeditated attempted murder (counts 2 & 3), shooting at an inhabited dwelling (counts 4, 5, & 6), and discharging a firearm from a motor vehicle (counts 7, 8 & 9). The jury also found true the special circumstance of drive-by murder and special allegations that Petitioner personally used a firearm and personally and intentionally discharged a firearm causing death as related to count one. It was also found true that Petitioner personally and intentionally discharged a firearm causing great bodily injury and personal infliction of great bodily injury as to counts two and

three.  As to counts four, five, seven and eight, it was found that Petitioner inflicted great bodily injury as a result of discharging a firearm.

Petitioner was sentenced to a term of life without the possibility of parole, plus two terms of 25 years to life, plus two terms of life with the possibility of parole.

Petitioner filed a timely notice of appeal.  On September 30, 2011, the California Court of Appeal, Fifth Appellate District affirmed the judgment.

On October 31, 2012, Petitioner filed a petition for writ of habeas corpus in the California.  The petition was denied on January 3, 2012.

Petitioner filed the instant federal petition for writ of habeas corpus on December 28, 2012.  Respondent filed an answer to the petition on March 8, 2013, and Petitioner filed a traverse on May 20, 2013.

## II.

## STATEMENT OF FACTS[1]

> On the evening of June 23, 2007, victim Rene Puga was standing outside the Tulare Arms apartment complex (the apartment complex) in Shafter talking with his friends, Eric Rodriguez and Juan Barrios.  Rodriguez lived in one of the apartments.  Two additional friends, Alfredo Ayon and Freddier Myhre, drove up in Myhre's green Mercury Cougar (the Cougar) and joined the group.  Myhre asked Rodriguez for a gun.  Rodriguez, who possessed a sawed-off shotgun, refused to give it to Myhre.  Yet, Rodriguez offered to "got with them if they needed a gun."  Ayon and Myhre then told Rodriguez they were in a convenience market when [Petitioner] pulled up in a vehicle and Jose "shot at them a few times."  Sergio Saldivar arrived and joined the group.  Barrios heard Saldivar say something about being shot at, either that day or on the day before.  Rodriguez, Ayon, and Myhre decided to find [Petitioner].  Around 7:00 or 8:00 p.m., they got into the Cougar and headed toward Pedro's house.  Rodriguez took his shotgun with him.
>
> Meanwhile, Jose, [Petitioner] and [Petitioner's] girlfriend, Sonia Garza, spent the day together.  Sometime after dark, they returned to the apartment where [Petitioner] and Garza resided.  They were sitting outside when the Cougar stopped in front of a nearby alley.  Rodriguez jumped out of the car.  He pointed the shotgun toward [Petitioner and his codefendant] and walked toward them.  Rodriguez hit Pedro several times in the head with the shotgun.  Jose stabbed Rodriguez in the right armpit and Rodriguez dropped the gun.  When Rodriguez bent to retrieve the gun, Jose stabbed him in the left

---

[1] This statement of facts is taken from the appellate court's September 30, 2011, decision in People v. Trujillo et al., F060330, 2011 WL 4509485, which is presumed correct.  28 U.S.C. § 2254(e)(1).

2

torso. [Petitioner] fell on the ground and Rodriguez hit him with the shotgun. Ayon and Myhre got out of the car. Ayon tried to hit [Petitioner] but Garza pushed him away. Garza went inside the apartment to protect her children. Hearing police sirens, Rodriguez, Ayon and Myhre got back into the Cougar and drove back to the apartment complex.[2]

Rodriguez was bleeding profusely from his stab wounds and Ayon was injured. Rodriguez hid his shotgun inside his apartment. Then the three men and Rodriguez's girlfriend got back into the Cougar and headed for the hospital. On the way Myhre was involved in a high-speed police chase. Consequently, Rodriguez arrived at the hospital by ambulance. Rodriguez required surgery to treat a stab wound to his upper left abdomen which punctured his diaphragm and stomach.

After Rodriguez and his associates drove away, [Petitioner] and Jose cleaned up from the fight. Then they got into Garza's red Isuzu Trooper (the Isuzu) and drove to the apartment complex. [Petitioner] drove and Jose sat in the front passenger seat. Barrios and several other people, including Puga and victims Valerie Leyva and Josefa Villareal, were socializing in front of the apartments. Rodriguez's father, Raul Rodriguez (Raul) was present inside the truck.

[Petitioner] drove by the apartment complex twice and stopped the second time. Jose looked over at the crowd of people. Jose leaned backwards as [Petitioner] leaned forward across Jose and pointed a semi-automatic handgun out the open passenger window. [Petitioner] fired five to seven shots[3] through the open window into the crowd and then drove away. Barrios testified [Petitioner] was the shooter and Jose was the passenger.[4] Raul identified [Petitioner] as the shooter but he could not identify the passenger. Both Barrios and Raul identified the vehicle as a red sports utility vehicle.[5] Raul had seen Pedro driving the same vehicle once before. Raul followed the Isuzu as it drove away but he did not catch up to it because his daughter-in-law had jumped in the truck's bed and, after he stopped to let her into the truck's cab, she convinced him to go to the hospital to see his injured son.

Puga suffered two gunshot wounds, including a fatal shot to the chest and died at the scene. Leyva was shot in the left leg and required surgeries to repair damage to her knee. Villareal was shot in the right calf and the resulting wound required stitches.

---

[2] The two dismissed assault charges (counts 10 & 11) were based on this incident.

[3] Seven spent .45-caliber shell casings consistent with a semi-automatic handgun were recovered from the crime scene. Barrios recalled hearing five to six shots.

[4] Barrios was in custody on another matter when he was contacted by investigating detective Chris Grider about the drive-by shooting. Barrios selected [Petitioner] and Jose's pictures from a photographic lineup.

[5] It can reasonably be inferred that this vehicle was the Isuzu.

3

1   At some point later in the evening Antonio Trujillo, who is one of [Petitioner's]
2   nephews and one of Jose's cousins, drove [Petitioner] from a relative's house to a
    cemetery in Shafter. He was gone about 20 minutes. Soon after he returned, he heard
3   sirens and something burning in the orchards. It was Garza's Isuzu.

4   In mid-August of 2007, [Petitioner was] arrested in Canada after they sought work
    permits. It appears to a Canadian border control officer that [Petitioner] had been
5   illegally working in Canada for about a month.

6   At the time of the drive-by shooting, [Petitioner], Jose and Rodriguez were members of
7   a Surenos affiliated gang named Varrio West Side (VWS). Barrios thought Puga was a
    VWS member. VWS was the only gang in Shafter and members of the gang fought
8   each other as an everyday occurrence. Barrios denied being a member of VWS but
    acknowledged that he asked to be placed in protective custody rather than to be housed
9   with Nortenos in jail. Barrios testified that if someone does something disrespectful to
10  a gang member, that person must retaliate even if it is against someone else who was
    simply associated with the person who was disrespectful. Barrios testified the Mexican
11  Mafia had placed a ban on drive-by shootings punishable by death.

12  Jose testified in his own defense. He admitted being a Sureno gang member and said
    that in June 2007 gang leadership placed a ban on drive-by shootings that was
13  punishable by death. Jose testified that on the day the drive-by shooting occurred,
    Rodriguez attacked [Petitioner] and he stabbed Rodriguez to protect his uncle. Jose
14  said he was armed with a knife because there was a power struggle going on in VWS
15  and "[e]verybody's fighting against each other." Jose testified that after Rodriguez and
    the other attackers drove away, he and [Petitioner] went into [Petitioner's] apartment
16  and tended their wounds. Then [Petitioner] drove him in the Isuzu to his grandmother's
    house. Jose testified that when they arrived at his grandmother's house, he told two
17  "young guys" who used the monikers "Sapo" and "Sporty" about the fight. Jose did
18  not know Sapo's or Sporty's legal names or addresses. Sapo and Sporty asked for the
    keys to the Isuzu and [Petitioner] replied that the keys were in the car. Sapo and Sporty
19  got into the Isuzu and drove away. Jose testified that he was listening to a police
    scanner when he heard there had been a shooting on Tulare Avenue. Then he heard the
20  police broadcast his name and [Petitioner's] name plus their monikers as being wanted
21  in connection with a shooting. The police also broadcast the name and moniker of
    Jose's brother, Jose Antonio Trujillo (Pineda). He and [Petitioner] decided to leave the
22  area. A relative drove them to a cemetery and they got a ride to Wasco. On the
    following morning, Jose heard on the police scanner that he and [Petitioner] were
23  wanted in connection with "the murder." They stole a car, headed north and eventually
24  crossed illegally into Canada by walking through a fenceless field.

25  In rebuttal, Shafter police dispatcher Sheila McCaleb testified who was on duty on the
    night of the shooting. She is trained to listen to all radio traffic. When officers arrived
26  at a crime scene they call her and she immediately enters information into a computer,
27  and the information is printed out in a "CAD report." The CAD report for the drive-by

28  ///

4

> shooting does not contain a suspect's name and she does not recall any officer providing her with a name of a suspect on the evening of the shooting.

(People v. Trujillo, et. al., No. F060330, 2011 WL 4509485, at *1-*4, footnotes in original.)[6]

### III.

### DISCUSSION

#### A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

#### B.  Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[6] The Court takes judicial notice of the California Court of Appeals, Fifth Appellate District's decision dated September 30, 2011.  Pursuant to Rule 201 of the Federal Rules of Evidence, this Court may take judicial notice of filings in another case.  See Biggs v. Terhune, 334 F.3d 910, 916 n.3 (9th Cir. 2003) (materials from a proceeding in another tribunal are appropriate for judicial notice); Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (noting that a court may take judicial notice of "matters of public record"); United States v. Camp, 723 F.2d 741, 744 n.1 (9th Cir. 1984) (citing examples of judicially noticed public records).

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to

findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 131 S.Ct. at 784.

**C.      Review of Petition**

1.      Due Process Challenge to Accomplice Instruction

Petitioner contends that the accomplice instruction given to the jury violated his federal right to due process because it was erroneous under state law and encroached on his right not to present evidence and lowered the prosecutor's burden of proof.

The California Court of Appeal, Fifth Appellate District found this claim to be without merit stating, in pertinent part:

> **2. Accomplice instructions were properly given and correctly stated the law.**
>
> [Petitioner] raises several challenges to the accomplice instructions (CALCRIM Nos. 301 and 334).  Initially, he argues that accomplice instructions were inapplicable because neither Jose nor Pineda gave any testimony that tended to incriminate [Petitioner].  Then he argues CALCRIM Nos. 301 and 334 improperly undermined the credibility of key defense witnesses by singling them out for special scrutiny.  He contends that if the jurors believed Jose and/or Pineda were accomplices, then they would infer from CALCRIM No. 301 that all of their testimony should be viewed with caution.  Pedro also argues to the extent the accomplice instructions were technically correct, they were confusing and contradictory as well as partisan and argumentative. [Petitioner] asserts this alleged instructional error was of constitutional dimension because the accomplice instructions shifted the burden of proof to the defense, violated the presumption of innocence and right to compulsory process.  Jose joins in these claims to the extent they benefit him.  As will be explained, none of these arguments is convincing.
>
> **C. Accomplice instructions may be given when the accomplice was called as a defense witness.**
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Federal courts have rejected a due process challenge to the giving of accomplice instructions where the accomplice testified as a defense witness.  In United States v. Tirouda (2005) 394 F.3d 683 (Tirouda), the Ninth Circuit held that a properly

7

formulated accomplice instruction may be given "whether [an accomplice] testifies for the prosecution or the defense." (Id. at p. 687.)  Also, informing the jury an accomplice's testimony must be viewed with greater caution than other witnesses did not violate the defendant's federal constitutional due process rights.  (Id. at pp. 687-688.)  It explained, "An accomplice's testimony may be suspect, regardless of whether he testifies for the prosecution or the defense."  (Id. at p. 687.)

Thus, under Guiuan and Tirouda, legally correct accomplice instructions may be given when factually appropriate, even when the accomplices are called as defense witnesses.  Accordingly, we reject [Petitioner's] contention that giving accomplice instructions was legally impermissible and violated his constitutional rights because Jose and Pineda were called as defense witnesses.

**D. Accomplice instructions were factually warranted**

We now turn to [Petitioner's] claim that accomplice instructions were not applicable under the facts of the case because neither Jose's nor Pineda's testimony tended to incriminate him.  We agree with respondent that this contention lacks merit.

Respondent persuasively argues that Jose incriminated himself and [Petitioner] during his testimony.  Jose admitted that after the fight with Rodriguez, [Petitioner] drove away from the apartment he shared with Garza in the Isuzu.  Jose admitted he was a passenger in this vehicle.  A red SUV was used in the drive-by shooting and two people identified [Petitioner] as the driver.  Jose also admitted that he and [Petitioner] stole a car and fled the country together within hours after the shooting occurred.  A reasonable jury could find Jose's testimony incriminated both Jose and [Petitioner] by corroborating the People's theory of motive, placing [Petitioner] as the driver of the Isuzu shortly before the drive-by shooting and Jose as a passenger, and proving flight immediately following the shooting.

Determining if Pineda could be found by the jury to be an accomplice presents a closer question.  The People did not proffer evidence directly linking Pineda to the drive-by shooting.  Rather, it was Pineda who connected himself as a participant during his testimony when he testified that Barrios identified him as the shooter.  Pineda testified that Barrios circulated rumors that Pineda was the shooter.  Pineda said that he confronted Barrios at the jail because Barrios was telling people that Pineda was the shooter.  Pineda also testified that gang members , including Puga's older brother, "had it out for us.  They got hits on us for what happened."  Pineda testified that he was "green lit" as a result of the drive-by shooting.  From this testimony, a jury could reasonably infer that prior to trial Barrios told others that Pineda was one of the participants in the drive-by shooting.  We, therefore, conclude there was sufficient evidence to support the giving of accomplice instructions with respect to Pineda.

8

**E.  CALCRIM Nos. 301 and 334 are legally correct statements of the law and were not misleading, confusing or argumentative.**

We now turn to [Petitioner's] challenge to the specific language of the accomplice instructions.  [Petitioner] argues CALCRIM No. 301 was legally incorrect because it stated the testimony of an accomplice requires supporting evidence, without specifying that only incriminatory testimony requires corroboration.  He contends that the jurors would infer from CALCRIM No. 301that all of their testimony should be viewed with caution.  We are not convinced.

CALCRIM NO. 301 cannot be considered in isolation from the rest of the jury charge.  CALCRIM No. 334 unequivocally instructed that the "statement or testimony of an accomplice that *tends to incriminate the defendant* should be viewed with caution." (CALCRIM No. 334, italics added.)  It is not reasonably likely that the jury misapplied CALCRIM No. 301 to require supporting evidence before any of Jose's or Pineda's testimony could be used to prove a fact.  Reasonably read, the accomplice instructions adequately informed the jurors that only incriminatory testimony of an accomplice must be corroborated.  Jurors would not have understood CALCRIM No. 301 in the manner urged by Pedro.

Furthermore, we do not find the accomplice instructions confusing or argumentative.  The jurors would have understood from CALJIC No. 301 the general principle that the testimony of a single witness is sufficient to prove a disputed fact, with the exception of accomplice testimony which requires corroboration.  It then would have understood from CALCRIM No. 334 the specific perimeters of the accomplice corroboration rule.  There was nothing confusing or contradictory in CALCRIM No. 301 and CALCRIM No. 334.  Also, the instructions were not argumentative or partisan.  CALCRIM No. 301 and CALCRIM No. 334 neutrally set forth the accomplice corroboration rule in a manner that did not favor either party.

Having rejected all of the challenges to the accomplice instructions, it follows that these instructions did not infringe any of [Petitioner's] constitutional rights.  The cases cited by [Petitioner] are not analogous because none of them dealt with legally correct instructions on accomplice liability.  The rule requiring corroboration of inculpatory accomplice testimony is not constitutionally infirm and protects non-testifying codefendants.  (Guiuan, supra, 18 Cal.4th at p. 568; Tirouda, supra, 394 F.3d at p. 687.)  Accordingly, we hold the accomplice instructions were factually applicable in this case, were legally correct, and did not infringe any of [Petitioner's] state or federal constitutional protections.

**F. The alleged error is harmless**

Assuming for purposes of this discussion only that CALCRIM No. 301 should have been modified, the instructional error was undoubtedly harmless even if we apply the stringent Chapman standard.  (Chapman, supra, 386 U.S. at p. 24.)  As we will explain, the instruction on accomplice liability did not play any part in the jury's verdict and, therefore, [Petitioner] was not prejudiced by the alleged instructional error.

9

>The jury undoubtedly rejected Jose's testimony that he and [Petitioner] did not commit the drive-by shooting because it was unworthy of belief, not because of any error in the accomplice instructions. Jose's claim that two young gang members who he barely knew were so enraged by the attack on [Petitioner] and Jose, that they jumped into the Isuzu and committed the drive-by shooting was entirely unbelievable. Jose did not know the real names or addresses of Sapo and Sporty. No other testimony or inference from any trial evidence suggested that Sapo and Sporty even existed, much less that they committed the drive-by shooting. We agree with respondent that Jose's testimony that he and [Petitioner] "would not retaliate immediately for the severe beating they received did not match who they were or the gang culture in which they lived. That they would flee immediately and go all the way to Canada because they were innocent was not credible. The eyewitness testimony was compelling, especially so since, just before [Petitioner] fired, people outside the apartments commented that those were the guys that had stabbed Rodriguez and Ayon."
>
>In addition, Pineda's testimony was not likely to have had any importance to the verdicts. Pineda did not provide Jose or [Petitioner] with an alibi, corroborate Jose's claim that Sapo and Sporty drove off in the Isuzu immediately prior to the drive-by shooting, identify anyone else as the perpetrators or admit any involvement in the attack. No evidence was proffered to support Pineda's testimony that Barrios spread rumors that he was one of the perpetrators. On the other hand, Pineda did not directly incriminate [Petitioner]. Therefore, there is no chance that the accomplice instructions impacted the jury's consideration of Pineda's testimony.
>
>Finally, during closing arguments the prosecutor did not mistake the law of accomplice liability or erroneously argue that because Jose and/or Pineda were accomplices, all of their testimony was required to be corroborated.
>
>For all of these reasons, we conclude it is not reasonably possible that the allegedly erroneous instruction on accomplice liability contributed to the verdict. Thus, the alleged error is harmless beyond a reasonable doubt.

(People v. Trujillo, et. al., 2011 WL 4509485, at *15-*19.)

Petitioner contends the accomplice instruction was erroneous under state law which in turn violates federal due process. Petitioner cites Hicks v. Oklahoma, 447 U.S. 343 (1980), as authority for the proposition that a state's failure to follow its own law results in a due process violation. He argues California law forbids giving this instruction if an accomplice testifies for the defense.

First, the fact that an instruction was incorrect under state law is not a sufficient basis for habeas relief. See Marshall v. Lonberger, 459 U.S. 422, 438, n.6 (1983). The determination by this court is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction

10

violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973). If there is not a reasonable likelihood that the jury applied the instruction in a way that violates the Constitution, no due process violation has occurred. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Jury instructions must be evaluated in the context of the instructions as a whole and the trial record. Id.

To the extent Petitioner argues that accomplice instructions were incorrect because it was stated the testimony of an accomplice requires supporting evidence, without specifying that only incriminatory testimony requires corroboration, such claim is not cognizable via section 2254. Although California law requires that accomplice testimony be independently corroborated, in federal court, "a conviction may be based on the uncorroborated testimony of an accomplice." United States v. Turner, 528 F.2d 143, 161 (9th Cir. 1975); United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions"); Harrington v. Nix, 983 F.2d 872, 874 (9th Cir. 1993) ("[S]tate laws requiring corroboration do not implicate constitutional concerns that can be addressed on habeas review."). Thus, because the California Court of Appeal held on direct review that the accomplice instructions were a correct statement of state law, this Court cannot second guess such binding determination. Accordingly, Petitioner's reliance on Hicks is misplaced as he is simply attempting to constitutionalize an alleged violation of state law.

Petitioner essentially contends that by instructing the jury to view Jose's and Pineda's testimony with distrust, the trial judge undermined his defense. The Court does not agree. First, the instruction given in this case did not simply tell the jury to view Jose's or Pineda's testimony with distrust. The instruction also stated that "Any (statement/or testimony) of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that (statement/or testimony) the weight you think it deserves after examining it with care and caution and in the light of all the other evidence." (CALCRIM 334; CT 789-790.) Second, the jury was also instructed as to the sufficiency of the evidence necessary to corroborate accomplice testimony (CALCRIM Nos. 301, 334; CT 780, 788-790), prior consistent and inconsistent statements of witnesses (CALCRIM Nos. 226, 318; CT 776-777, 785), discrepancies in testimony (CALCRIM No. 226; CT 776-777), willfully false testimony (CALCRIM No. 226; CT 776-777),

11

weighing conflicting testimony (CALCRIM No. 302; CT 781), and the factors to be considered in determining the believability of a witness (CALCRIM 226; CT 776-777).

Furthermore, considering CALCRIM No. 301 in light of CALCRIM No. 334, the instruction that immediately preceded it, along with the entirety of the instructions as a whole, it is not reasonably likely that the jury misinterpreted CALCRIM No. 301 to require supporting evidence before any of the accomplice's testimony could be considered in support of Petitioner's defense.

Indeed, the United States Supreme Court has recognized that instructions informing jurors to treat accomplice testimony with care and caution are routinely given. Cool v. United States, 409 U.S. 100 (1972) ("In most instances, they represent no more than commonsense recognition that an accomplice may have a special interest in testifying, thus casting doubt upon his veracity."). In Cool, the Supreme Court reversed a conviction because the jury was instructed to disregard the testimony of a defense accomplice witness *unless* it was convinced beyond a reasonable doubt as to the witness's credibility. Id. at 102. The Court concluded,

> [t]here is an essential difference between instructing a jury on the care with which it should scrutinize certain evidence in determining how much weight to accord it and instructing the jury, as the judge did here, that as a predicate to the consideration of certain evidence, it must find it true beyond a reasonable doubt.

Id. at 104. Unlike in Cool, the instruction given in this instance did not shift the burden of proof by directing jurors to discredit the witness's testimony unless it found it credible beyond a reasonable doubt. Rather, the instruction properly addressed only the weight to be afforded the evidence. See United States v. Tirouda, 394 F.3d 683, 688 (9th Cir. 2005) ("Unlike the accomplice witness instruction disapproved in Cool, the instruction here did not predicate the jury's acceptance of [the accomplice's] testimony on finding it true beyond a reasonable doubt."). Therefore, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254.

2.  Failure Instruct Jury on Witness Dissuasion

Petitioner contends the trial court committed constitutional error by failing to instruct the jury on witness dissuasion. Petitioner maintains the error was of "constitutional magnitude," but he fails to identify what specific constitutional provision was violated. Instead, Petitioner cites to state and

federal rules of evidence and references the Supreme Court's decision in Cupp v. Naughton, 414 U.S. 141, 146-147 (1973), involving federal due process. Respondent initially argues that this claim was presented on direct appeal as a challenge under state law only.

The Court of Appeal denied the claim in the last reasoned decision stating in pertinent part:

At the prosecutor's request, the court gave CALCRIM NO. 371, "Alternative A" (alternative A), which instructs on suppression or destruction of evidence as proof of consciousness of guilt. . . . As will be explained, the court did not have a sua sponte duty to give alternative C. . . .

[N.10] In its entirety, CALCRIM No. 371, provides:

[If the defendant tried to hide evidence or discourage someone from testifying against (him/her), that conduct may show that (he/she) was aware of (his/her) guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.]

[If the defendant tried to create false evidence or obtain false testimony, that conduct may show that (he/she) was aware of (his/her) guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.]

[If someone other than the defendant trier to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show the defendant was aware of (his/her) guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself.]

[If you conclude that a defendant (tried to hide evidence[,]/discouraged someone from testifying[,]/[or] authorized another person to (hide evidence/ [or] discourage a witness)), you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other defendant is guilty or not guilty.

**1. Facts.**

**a. Trial testimony pertaining of destruction or suppression of evidence.**

Evidence was presented showing that the Isuzu was burned within a few hours after the drive-by shooting occurred.

In relevant part, Barrios testified that he was in custody because he failed to appear as a witness in this case. He explained that he felt threatened by members of [Petitioner's] family on two occasions. Once, he failed to appear and testify because he felt threatened when he saw [Petitioner's] relatives. On another occasion, he and Pineda

13

were both in jail.  Pineda confronted him and made a hand motion indicating Barrios would be killed if he testified against [Petitioner].

Although neither [Petitioner] objected to Barrios's testimony about being threatened, the court informed counsel outside the presence of the jury that it had allowed this testimony because it was relevant to Barrios's credibility and "[t]here is no requirement that the threats be corroborated or that the witness' fear of retaliation be directly linked to the defendant for the threat to be admissible."  Then the court stated, "If counsel wishes a limiting instruction, kindly prepare one."  [Petitioner's] attorney replied "No, your Honor, at this time, at least on behalf of [Petitioner], I think the Court has summarized the law correctly, at least the law as I understood it on this point."  Jose's counsel did not reply.  Neither [Petitioner] nor Jose submitted a proposed limiting instruction.

Deputy Jeffrey Stockton, a detention officer at the Lerdo jail facility, testified that he saw Barrios and Pineda standing face to face in the middle of a cell on January 7, 2010.  It was clear to the deputy "that the two of them were having a verbal confrontation" but the deputy did not hear what the two men said to each other.  After the deputy separated them, Barrios told him that he was going to testify against Pineda's brother.

Jose's brother Pineda was called as a defense witness.  In relevant part, he testified that he confronted Barrios when they were in jail together.  Pineda said that he asked Barrios why Barrios told people that he killed Puga.  Barrios did not reply.

**b. Trial proceedings relating to CALCRIM No. 371**

Neither Jose nor Pedro requested any instruction on the topic of suppression of evidence or dissuading a witness.  The prosecutor requested CALCRIM No. 371, alternative A.  Alternative A, was discussed during one of the instructional conferences.  The court stated that it would cross out a phrase in alternative A pertaining to discouraging someone from testifying because there was no evidence that the defendants attempted to discourage a witness from testifying.  The court stated, "The only possibility might be the apprehension of Mr. Barrios, but I don't think … this would apply to that.  [¶] . . . [¶]  And I don't think you have any direct link that either defendant - -"  The prosecutor interrupted, stating "Right, I don't."  The court continued, "But I think you need to give this as a cautionary instruction."  Then the court stated it would excise the portion of alternative A relating to a defendant's act of authorizing another person to hide or destroy evidence.  The prosecutor agreed that there was "no evidence of authorizing another person to hide or destroy."  At this point, [Petitioner's] counsel asked, "What evidence is [the prosecutor] talking about?"  The prosecutor replied, "The destruction of the vehicle."  [Petitioner's] counsel responded, "Oh that's a pretty good example, yes."  Then [Petitioner's] counsel asked, "Are we crossing out alternative B, then?"  The court and the prosecutor replied, "Yes."  Then the court asked, "[Alternatives] B and C, right?"  The prosecutor replied, "Yes."  Jose's counsel did not make any comments during the discussion of CALCRIM No. 371.

>   As part of its closing instructions, the court gave alternative A, as modified during the instructional conference: "If the defendant tried to hide and/or destroy evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. If you conclude that a defendant tried to hide and/or destroy evidence, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether the other defendant is guilty or not guilty.

(People v. Trujillo, 2011 WL 4509485, at *10-*11.)

First, Petitioner's claim does not raise a federal question as required by section 2254. Federal habeas corpus is available only on behalf of a person in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. at 68. "A federal court may not issue the writ on the basis of a perceived error of state law. Pulley v. Harris, 465 U.S. 37, 41 (1984). In addition, Petitioner's argument that the ruling violated the federal rules of evidence is likewise not cognizable because those rules are not constitutionally based. Darling v. United States, 493 U.S. 342, 352-353 (1990). Furthermore, Petitioner cannot transform a state law claim into a federal issue by merely asserting a due process violation. If such were the case, "every erroneous decision by a state court on state law would come [to federal court] as a federal constitutional question." Gryger v. Burke, 334 U.S. 728, 731 (1948); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).

Even if Petitioner presented a federal due process claim in the instant petition, it is unexhausted because this claim was raised solely as a challenge under state law to the California Supreme Court. (LD No. 64, at 7-8.) Nonetheless, there is no merit to Petitioner's claim and it must be denied. See Cassett v. Stewart, 406 F.3d 614, 623-624 (9th Cir. 2005) (a district court may deny an unexhausted claim on the merits under § 2254(b)(2) when it is perfectly clear that the applicant does not raise even a colorable federal claim). Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the

context of the overall charge to the jury as a component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.).  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal."  Id.

### 3. Brady Violation

Petitioner contends that his right to a fair and impartial trial was violated because the prosecution withheld exculpatory impeachment evidence concerning witness Barrios.  Petitioner raised this claim by way of habeas corpus petition to the California Supreme Court.  The petition was summarily denied.

In Strickler v. Greene, 527 U.S. 263, 281-282 (1999), the Supreme Court identified the following three components of a Brady violation: (1) favorable evidence that was exculpatory or impeaching; (2) the evidence was suppressed by the State willfully or inadvertently; and (3) there was prejudice as a result.  A conclusory allegation of the failure to disclose evidence without identifying what was not disclosed is insufficient to demonstrate habeas corpus relief.  Jones v. Gomez, 66 F.3d 199, 204-205 (9th Cir. 1995).

The record in this case does not support Petitioner's claim.  Barrios testified at Petitioner's trial and acknowledged that he was arrested in December 2009 on a residential burglary charge.  (RT 720.) The bail demand, initially set at $10,000, had been withdrawn, and Barrios had been released on his own recognizance on January 11, 2010.  Id.  At the time Barrios testified on March 5, 2010, he was awaiting court on his case within the next few weeks.  Id. at 714, 723.  However, his attorney later indicated that there was not enough evidence to proceed against him on the burglary charge.  Id. at 623-624.  Petitioner received discovery regarding this matter, and the defense spoke with the

prosecutor directly about the case. Id. at 811, 813. In addition, the prosecutor testified at Petitioner's trial about the evidence against Barrios, but not Petitioner, as to the burglary charge. Id. at 829-839. He expressly denied making any promises to Barrios on the burglary case in connection with his testimony in Petitioner's case. Id. at 839. Furthermore, the prosecutor was subjected to cross-examination by Petitioner. Id. at 840, et. seq.

Petitioner fails to demonstrate a Brady violation because he has not produced any evidence that the prosecution suppressed evidence. Although Petitioner contends that Barrios was given a plea deal in exchange for his testimony in Petitioner's case, there is no evidence in the record to support such contention. The prosecutor was specifically asked and denied, under oath, that any promises were given to Barrios in exchange for his testimony in Petitioner's case. Petitioner's contention amounts to nothing more than a conclusory and speculative assertion. If this Court were to grant habeas corpus relief "on the basis of little more than speculation with slight support" it would upset the "delicate balance between the federal courts and the States." Wood v. Bartholomew, 516 U.S. 1, 8 (1995).

## IV.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to entered in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and

///
///
///
///
///

Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **September 10, 2013**

UNITED STATES MAGISTRATE JUDGE